**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| CINDY GILLMAN, | ) | |
| | ) | CASE NO.    5:09-cv-01175 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security | ) | **MEMORANDUM OPINION & ORDER** |
| | ) | |
| Defendant. | ) | |

Plaintiff Cindy Gillman ("Gillman") challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying her claim for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Title II and Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423, 1381 *et seq*.  The Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, this Court VACATES and REMANDS the final decision of the Commissioner for further proceedings consistent with this opinion.

## I. Procedural History

On January 27, 2005, Gillman filed an application for POD, DIB, and SSI alleging a disability onset date of May 15, 2003 and claiming that she was disabled due to manic depression and pain in her lower back, shoulder, and neck. Her application was denied both initially and upon reconsideration. Gillman timely requested an administrative hearing.

On July 1, 2008, an Administrative Law Judge ("ALJ") held a hearing during which Gillman, represented by counsel, testified. Bruce Holderead testified as the vocational expert ("VE"). On August 12, 2008, the ALJ found Gillman was able to perform a significant number of jobs in the national economy and, therefore, was not disabled. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied further review.

On appeal, Gillman claims the ALJ erred because: (1) substantial evidence does not support the finding that she was capable of performing work activity *after* March 4, 2006 – her 50th birthday; and, (2) substantial evidence does not support the finding that she was capable of performing work *prior* to March 4, 2006. (Pl.'s Br. at 11-15.)

## II. Evidence

*Personal and Vocational Evidence*

Born on March 4, 1956, and age fifty-two (52) at the time of her administrative hearing, Gillman is a "person closely approaching advanced age" under the social security regulations. *See* 20 C.F.R. §§ 404.1563(d) & 416.963(d). Gillman has a tenth-grade education. (Tr. 27, 344.) She has past relevant work as a packager and assembler.

*Medical Evidence*

On May 14, 2003, Gillman told Donald Carter, M.D., that her back gave out at work

2

while she bending over to pick an item up from the floor. (Tr. 178.)

Over the next few months, Gillman continued to complain to Dr. Carter of pain in her back, which radiated to her left hip. (Tr. 176-178.)

On September 23, 2003, Ned Nafziger, M.D., examined Gillman for her workers' compensation claim. (Tr. 153-155.) His examination revealed "functional forward flexion with pain at end range of in the left lumbosacral region." (Tr. 153A.) Gillman transferred slowly and ambulated slowly without a significant antalgic gait pattern. *Id*. No radicular pain was produced at that time. *Id*. Bilateral patellar deep tendon reflexes were graded at 2/4 at the bilateral patellar and 1/4 at the bilateral Achilles' tendons. (Tr. 154.) Dr. Nafziger opined that Gillman's work limitations would not be significantly changed from those recommended by Dr. Carter. (Tr. 155.) He concluded that Gillman would need job restrictions including no lifting greater than twenty pounds, no repetitive lifting, bending, pushing or pulling, and she may need to change her position every forty-five minutes to one hour. (Tr. 155.)

On June 30, 2004, Gillman complained to Dr. Carter of pain in her back and her legs. (Tr. 204.) On October 4, 2004, Gillman told Dr. Carter that she had pain in her back. (Tr. 203.) On January 2, 2005, Gillman reported that she continued using a TENS unit, mostly on her left lower back. (Tr. 202.) On January 19, 2005, Dr. Carter completed a medical source statement opining that Gillman must change positions every 1 to 2 hours. (Tr. 260.) Gillman's impairments did not affect her ability to understand, remember, and carry out instructions. (Tr. 259.) She was moderately limited in her ability to respond appropriately to changes in the work routine and to work pressures in a usual work setting. *Id*. Dr. Carter further stated that Gillman had the following limitations: she could occasionally lift and/or carry 10 pounds only 1 to 2

3

hours at a time; she can frequently lift and/or carry less than 10 pounds; she can stand and/or walk less than 2 hours in an 8-hour workday (with changes of position); she must periodically alternate between sitting and standing; she is limited in her ability to push and/or pull in her lower extremities; she can occasionally crouch and stoop; and she can never climb, balance, kneel and/or crawl. (Tr. 261-62.)

On February 10, 2005, a representative for the state agency conducted an in-person interview with Gillman. (Tr. 100-03.) The representative noted that Gillman had no difficulty reading, understanding, concentrating, walking, sitting, standing, or hearing. (Tr. 101.) She did have a poor memory for details, was somewhat slow to respond, and her thinking seemed to be literal and concrete. (Tr. 102.)

On May 2, 2005, Dr. Carter refilled prescriptions for Darvocet and Xanax. (Tr. 201.) On August 30, 2005, Gillman complained of continuing back pain and depression, indicating that she was suicidal. (Tr. 201.) She was prescribed Zyprexa and advised to follow up if she had any problems. *Id*.

On October 10, 2005, Gillman continued to complain to Dr. Carter of back pain. (Tr. 200.) She noted she was having daily headaches and did not like the Zyprexa. *Id*. In addition, on October 10, 2005, Dr. Carter completed a form for the Stark County Department of Job and Family Services indicating that Gillman had been unable to work for one year due to back and leg pain, that she was unable to sit or stand for long periods – one hour, and she was unable to lift twenty pounds. (Tr. 214.)

On March 24, 2005, Gillman was examined by William E. Mohler, M.A., at the request of the Bureau of Disability Determination ("BDD"). (Tr. 220-223.) Gillman reported

4

having completed the eleventh grade in a special education program. (Tr. 220.) She indicated that she had a history of back problems and acid reflux. *Id*. She had been previously diagnosed with bipolar disorder, but was not currently taking any medications for the condition. *Id*. Mohler noted that Gillman was cooperative but not friendly, had a flat affect clearly suggestive of depression, and was mildly dependent needing some reassurance and encouragement. *Id*. He found no abnormalities in her speech and language, indicating that her speech was relevant, coherent, and entirely intelligible. (Tr. 220-21.) Mohler found Gillman's memory functions "were quite different depending on whether they were auditory or visual." (Tr. 221.) Her concentration was adequate, her persistence was okay although she was easily frustrated, her ability to abstract and generalize was mildly impaired, her insight and judgment were mildly impaired, and her ability to carry out arithmetic calculations mentally was severely impaired as she was able to handle only simple single digit addition and subtraction. *Id*. On the Wechsler Adult Intelligence Scale-III, Gillman achieved a Verbal IQ of 73, a Performance IQ of 78, and a Full Scale IQ of 74. (Tr. 221-222.) On the Peabody Individual Achievement Test, Reading-Comprehension section, Gillman yielded a raw score of 58 (a fourth grade level standard), a standard score of 57, and a percentile of less than one. (Tr. 222.) Mohler noted that Gillman's reading scores were well-below expectations based on education and intellectual levels. *Id*. On the Wechsler Memory Scale, Gillman's scores ranged from a low of 71 (3 percentile) in the Auditory Immediate category to a high of 112 (79 percentile) in the Visual Immediate category. *Id*. Mohler opined that Gillman's diagnosis of bipolar disorder appeared to be accurate, but noted that it was totally untreated. *Id*. Mohler assessed a Global Asessment of

Functioning (GAF) score of 50.[1] (Tr. 223.)   Finally, Mohler observed the following:

1. The claimant's mental ability to relate to others, including fellow worker and supervisors, is moderately impaired by her depression and borderline intellectual functioning and auditory memory.

2. The claimant's mental ability to understand, remember, and follow instructions is mildly impaired by auditory memory.

3. The claimant's mental ability to maintain attention, concentration, persistence, and pace to perform simple repetitive tasks is not impaired.

4. The claimant's mental ability to withstand the stress and pressures associated with day-to-day work activities is moderately impaired. Her existent bipolar disorder and depression, coupled with limited intellectual skills, gives her little wherewithal to deal with additional stressors.

(Tr. 223.)

On June 6, 2005, x-rays taken of Gillman's back revealed mild levoscoliosis, degenerative narrowing and spur formation at the margin of the T12-L1 level, and minimal spur formation at the L3-4 level. (Tr. 268-269.)

Also on June 6, 2005, Lokendra B. Sahgal, M.D., examined Gillman at the request of the BDD. (Tr. 265-273.) Dr. Sahgal's findings included tenderness in the paraspinous muscles in the lower back, point tenderness in the left sacroiliac joint, 4/5 left lower extremity muscle strength, and restricted ranges of motion in the cervical spine. (Tr. 266.) Gillman complained of right shoulder pain due to a previous history of dislocation. (Tr. 267.) Dr. Sahgal's clinical impression included a history of chronic back and neck pain, depression,

---

[1] A GAF score between 41 and 50 indicates serious symptoms or a serious impairment in social, occupational, or school functioning. A person who scores in this range may have suicidal ideation, severe obsessional rituals, no friends, and may be unable to keep a job. *See Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. revised, 2000).

and right shoulder dislocation. (Tr. 267.) Dr. Saghal concluded that Gillman's ability to do lifting and carrying was somewhat impaired due to her neck and back pain, but that she had no difficulty walking, handling objects, speaking, hearing, seeing, climbing, balancing, stooping, crouching, kneeling, and crawling. *Id*. She was able to bend with some pain. *Id*.

On June 24, 2005, state agency physician Kevin Goeke, Ph.D., reviewed the file and completed a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment. (Tr. 232-249.) He found that Gillman would be moderately limited in her abilities to carry out detailed instructions, to complete a normal workday and workweek without interruptions from psychologically based symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and to respond appropriately to changes in the work setting. (Tr. 246-247.)

On June 24, 2005, state agency physician Elizabeth Das, M.D., reviewed the file and completed a Physical Residual Functional Capacity Assessment. (Tr. 250-57.) She concluded that Gillman was capable of occasionally lifting and/or carrying 50 pounds, frequently lifting and/or carrying 25 pounds, standing and/or walking about 6 hours in an 8-hour workday, unlimited pushing and/or pulling, occasionally using a ladder/rope/scaffold, and limited overhead reaching with the right upper extremity. *Id*.

On February 16, 2006, Dr. Carter recommended Gillman undergo a new MRI, as the one performed a couple of years earlier was entirely normal. (Tr. 297.) Gillman complained of pain in her back and hips (left greater than right), which radiated into her left thigh. *Id*.

On July 20, 2006, Gillman presented to the emergency room ("ER") of Alliance

Community Hospital with complaints of worsening low back pain. (Tr. 280-83.) On examination, it was noted that she had bilateral lower lumbar tenderness and some evidence of spasm. (Tr. 282.)

On December 4, 2006, Dr. Carter noted that Gillman continued to have pain in her back, which had been ongoing for five years. (Tr. 295.) He stated that "[w]e surely agree that she is not likely to get back to any sort of gainful employment with the present system." *Id*.

On March 29, 2007, Dr. Carter indicated that Gillman could not afford an MRI and that he could not really ascertain her problems without one. (Tr. 290.).

On August 16, 2007, Dr. Carter refilled Gillman's prescriptions for Darvocet and Vicodin, and encouraged her to try to find some other occupation. (Tr. 289.)

On May 24, 2007, Dr. Carter again completed a medical source statement. (Tr. 291-94.) He opined that Gillman could occasionally lift and/or carry less than 10 pounds, could frequently lift and/or carry less than 10 pounds, could stand and/or walk at least 2 hours in an 8-hour workday, could sit less than 6 hours in an 8-hour workday, was limited in her use of her lower extremities to push and/or pull, and could occasionally climb, balance, kneel, crouch, crawl and stoop. (Tr. 291-92.)

On December 21, 2007, state agency reviewing physician Dave Sanford, Ph.D., completed a Psychiatric Review Technique form. (Tr. 305-18.) He diagnosed Gillman with bipolar disorder and borderline intellectual functioning. (Tr. 309.) He noted moderate limitations in activities of daily living; moderate limitations in maintaining social functioning; mild limitations in maintaining concentration, persistence, or pace; and one or two episodes of decompensation, each of extended duration. (Tr. 315.) He also completed a mental RFC

assessment and noted no evidence of limitation in Gillman's ability to understand and remember very short and simple instructions (Tr. 319.) He stated that her ability to understand, remember, and carry out detailed instructions was not significantly limited, and that her ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods was not significantly limited. (Tr. 319-20.)

On April 17, 2008, Dr. Carter opined that Gillman could occasionally lift and/or carry 20 pounds, could stand and/or walk less than 2 hours in an 8-hour workday, could sit less than 6 hours in an 8-hour workday, was limited in her use of her upper extremities to push and/or pull, and could never climb, balance, kneel, crouch, crawl and stoop. (Tr. 334-37.)

*Hearing Testimony*

At the hearing, Gillman testified to the following:

- She could not read the newspaper as she has only a third-grade reading level. (Tr. 344-45.)

- She had not worked since May 15, 2003. (Tr. 346.)

- She has pain in her lower back on the left side, which radiates down the leg. Her highest level of pain is a 6.5 on a ten point scale. She also has pain in her right shoulder. (Tr. 347-48.)

- She takes pain medication, which makes her drowsy. (Tr. 348.)

- She was not under the care of a psychiatrist, psychologist, or other mental health specialist, but was prescribed Paxil by her family doctor for depression. *Id.*

- She occasionally has difficulty thinking, concentrating, and focusing. She also has feelings of low self-esteem and experienced crying spells. (Tr. 348.)

- She can stand for twenty minutes and sit for twenty-five minutes before needing to change positions. She cannot lift more than ten pounds. She has difficulty climbing stairs, bending, stooping, crouching, crawling, kneeling, and sometimes

9

>   with her balance.  (Tr. 349-50.)
>
> • She has a drivers' license, does some light cooking, shops for groceries, does laundry, and goes out with her mother about once a month.  (Tr. 351-52.)

The ALJ posed the following hypothetical to the VE:

> Assume an individual situated as the Claimant's age, education and work experience.  Such an individual can lift 20 pounds occasionally, 10 pounds frequently, stand and/or walk about six hours during an eight hour work day, sit six hours out of an eight-hour work day.  Such an individual can occasionally climb ladders, rope and scaffolding, frequently climb ramps and stairs, frequently balance, stoop, crouch, kneel, and crawl.  Such an individual is limited to frequently reaching overhead with the right upper extremity and she is left-handed and such an individual is restricted to unskilled work with occasionally [sic] contact meaning interaction with the public, co-workers and supervisors.

(Tr. 356.)

The VE testified that such an individual could perform Gillman's past relevant work as performed. (Tr. 356-57.)  The VE had testified that Gillman's past work was unskilled, SVP 2, and light as actually performed. (Tr. 356.)  If a sit/stand option was added to the hypothetical, such a person would be unable to perform Gillman's past relevant work.  (Tr. 357.)  The VE further testified that such an option would essentially eliminate all remaining light work given Gillman's reading problems, as the remaining light work would be clerical in nature.  (Tr. 357.)  The VE, however, identified several sedentary, SVP 2, unskilled jobs that such a person could perform.  *Id*.  These include the following: order clerk, food and beverage; final assembler; and, table worker.  *Id*.  Gillman's counsel offered an additional limitation of low production demands and no quotas.  (Tr. 358.)  The VE testified that only the order clerk job would remain.  (Tr. 358-59.)

### III.  Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[2]

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Gillman was insured on her alleged disability onset date, May 15, 2003 and remained insured through the date of the ALJ's decision, August 12, 2008.  (Tr. 20.)  Therefore, in order to be entitled to POD and DIB, Gillman must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F. 2d 191, 195 (6th Cir. 1967).

---

[2]  The entire five-step process entails the following: First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled. For the fifth and final step, even if the claimant's impairment does prevent him from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

A claimant may also be entitled to receive SSI benefits under the Act when she establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must also meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

### IV. Summary of Commissioner's Decision

The ALJ found Gillman established medically determinable, severe impairments, due to mild levoscoliosis of cervical spine, mild degenerative changes of lumbar spine, right shoulder strain, borderline intellectual functioning, and bipolar disorder. However, her impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. Gillman is unable to perform her past work activities, but has a Residual Functional Capacity ("RFC") for a limited range of light work. The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Gillman is not disabled.

### V. Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence

but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

## VI.  Analysis

### *Work Capability After March 4, 2006*

Gillman argues that the ALJ erred, because Gillman was a person "closely approaching" advanced age, becoming fifty as of March 4, 2006. (Pl.'s Br. at 12-13.) Based on the ALJ's hypothetical, including the sit/stand option, the VE testified that a person with Gillman's limitations would be restricted to sedentary jobs due to her "reading problems, special ed." (Tr. 357.)

Pursuant to 20 C.F.R. pt. 404, Subpt. P, App. 2, § 201.00(g), "[i]ndividuals approaching advanced age (age 50-54) may be significantly limited in vocational adaptability if they are restricted to sedentary work. When such individuals have no past work experience or can no longer perform vocationally relevant past work and have no transferable skills, a finding of disabled ordinarily obtains." According to Table No. 1 in 20 C.F.R. pt. 404, Subpt. P, App. 2 § 201.09, a claimant who is closely approaching advanced age, has only unskilled work experience, and has a limited education or less should be found disabled.[3]

The Commissioner argues that the ALJ's RFC finding was for light work, not sedentary work, and that the VE essentially transformed the ALJ's RFC into one for sedentary work based on the VE's allegedly improper conclusion that Gillman had education and reading limitations.

---

[3] Pursuant to 20 C.F.R. § 404.1564(b)(3) & 416.964(b)(3), the regulations "consider that a 7th grade through 11th grade level of formal education is a limited education." A "marginal education" is generally considered formal schooling at a "6th grade level or less." *Id*. Finally, illiteracy is defined as an inability to read or write and is consistent with little or no formal schooling. *Id*.

13

(Def.'s Br. at 8-9.) The Commissioner argues that the ALJ was not bound by the VE's conclusion, as the ALJ specifically found that Gillman was not illiterate. (Tr. 27.) The Court disagrees with the Commissioner's characterization of the VE's testimony as contrary to the ALJ's finding that Gillman was not illiterate. The ALJ specifically asked the VE to consider a hypothetical person with the same education as Gillman. That would be one who never graduated high school, attended special education classes, and clearly did not read at a particularly high level, even though she may not technically be classified as illiterate as defined by the regulations. Pursuant to 20 C.F.R. pt. 404, Subpt. P, App. 2 § 201.09, a claimant need not be completely illiterate to compel a finding of disabled, but only have a limited education or less. Gillman's education falls into the limited category, rendering a clear determination of her occupational base crucial in determining whether she was disabled.

The significance of Gillman's requisite sit/stand option and educational/reading limitations is that they impact where Gillman's true exertional level lies. Clearly, Gillman's functional abilities lie somewhere between light work and sedentary work. Social Security Ruling ("SSR") No. 83-12, 1983 SSR LEXIS 32 (1983) offers adjudicative guidance for situations where the occupational base falls somewhere between two categories.

> 2. If the exertional level falls between two rules which direct opposite conclusions, i.e., "Not disabled" at the higher exertional level and "Disabled" at the lower exertional level, consider as follows:
>
> a. An exertional capacity that is only slightly reduced in terms of the regulatory criteria could indicate a sufficient remaining occupational base to satisfy the minimal requirements for a finding of "Not disabled."
>
> b. On the other hand, if the exertional capacity is significantly reduced in terms of the regulatory definition, it could indicate little more than the occupational base for the lower rule and could justify a finding of "Disabled."

> c. In situations where the rules would direct different conclusions, and the individual's exertional limitations are somewhere "in the middle" in terms of the regulatory criteria for exertional ranges of work, more difficult judgments are involved as to the sufficiency of the remaining occupational base to support a conclusion as to disability. Accordingly, VS [vocational specialist] assistance is advisable for these types of cases.

In the present case, Gillman's ability to perform the full range of light exertional work was reduced by the ALJ's RFC finding that Gillman had to have a sit/stand option and could only occasionally balance, stoop, kneel, crouch, and crawl. (Tr. 22.) Further eroding the occupational base for light work was a limitation to unskilled work requiring limited contact with the public, co-workers, and supervisors. *Id*. Based on these limitations, the VE testified that only clerical jobs would remain in the light category, which, he opined, Gillman could not perform based on her limited education and reading ability. (Tr. 357.)

Here, the ALJ failed to discuss the significance of the VE's testimony that Gillman could only perform jobs at the sedentary level and the ramifications of such a finding given the application of 20 C.F.R. pt. 404, Subpt. P, App. 2, § 201.00(g). The lack of any discussion concerning the applicable regulations was further compounded by the ALJ's failure to undertake any analysis consistent with SSR 83-12 to determine whether Gillman's occupational base had been so eroded in the light category as to render her only capable of sedentary work.

This Court cannot discern how the ALJ arrived at her apparent decision that Gillman's occupational base was more in line with light work than sedentary work. *See Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("we cannot uphold a decision by an administrative agency ... if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."); *Wilson v. Comm. of Soc. Sec.*, 378 F.3d 541, 544-546 (6th Cir. 2004). As such, Gillman's first

assignment of error is well taken.

### *Work Capability Before March 4, 2006*

Gillman also argues that the jobs identified by the VE require a greater reading ability than she possesses, and that the ALJ's finding regarding her literacy level is not supported by the record as a whole. (Pl.'s Br. at 14.) She points out that the ALJ's decision lacks any discussion regarding her reading test results, which showed that she read at a fourth grade level and ranked her in a percentile of less than one. Gillman also questions the ALJ's reliance on a questionnaire to rebut her illiteracy claim, as the questionnaire unequivocally states that the form was completed by Gillman's sister.[4] (Tr. 109.) However, as the Court finds that this matter should be remanded for the reasons discussed above, it need not be decided whether the ALJ's finding that Gillman was not disabled prior to March 4, 2006 was supported by substantial evidence. Nonetheless, a more thorough discussion of Gillman's reading capabilities would have been preferable, and the ALJ should include a more thorough examination of this issue upon remand.

---

[4] At the hearing, Gillman also testified that she had help from others filling out the disability forms. (Tr. 345.)

16

### VII. Decision

This matter is remanded for a new decision, and, if necessary, a new hearing in order for the ALJ to more clearly explain her findings. For the foregoing reasons, the Court VACATES the decision of the Commissioner and the case is REMANDED for further proceedings consistent with this opinion.

IT IS SO ORDERED.

<u>s/ Greg White</u>
U.S. Magistrate Judge

Date: February 18, 2010